UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| LEIGH ANN GRIFFIN, | ) | Civil Action No.: 4:12-0213-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| ERIC HOLDER, ATTORNEY GENERAL | ) | |
| OF THE UNITED STATES, FEDERAL | ) | |
| BUREAU OF PRISONS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.    INTRODUCTION

This employment discrimination case arises out of Plaintiff's employment with Defendant.

Plaintiff alleges claims of hostile work environment, retaliation and discrimination in violation of

Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12101, et seq.[1]  Presently before the Court is Defendant's

Motion for Summary Judgment (Document # 22).  All pretrial proceedings in this case were referred

---

[1]Although Plaintiff alleges violations of the ADA, the United States is specifically
excluded from the ADA's definition of employer, and, thus, a claim under the ADA will not
stand against the United States.  42 U.S.C. §§ 12111(2), 12111(5)(B); Cassity v. Geren, 749
F.Supp.2d 380, 384 (2010).  Rather, the Rehabilitation Act, 29 U.S.C. §§ 701 et. seq., provides
the exclusive judicial remedy for claims based upon a federal employee's disability.  Id. (citing
McGuinness v. United States Postal Serv., 744 F.2d 1318, 1322–1323 (7th Cir.1984); Boyd v.
U.S. Postal Serv., 752 F.2d 410, 413–414 (9th Cir.1985)).  Nevertheless, the Rehabilitation Act
and the ADA employ the same standards and purposes, and, thus, the court may rely on case law
addressing claims under either statute in analyzing a case of disability discrimination.  Smaw v.
Commonwealth of Va. Dept. of State Police, 862 F.Supp. 1469, 1474 (E.D.Va.1994) ("By
design, the ADA standards mirror those of the Rehabilitation Act in this case.... The emergence
of the ADA does not create a new avenue for claims in the area of disability discrimination;
rather, the ADA incorporates the existing language and standards of the Rehabilitation Act in this
area."); Hooven–Lewis v. Caldera, 249 F.3d 259 at 268 (4th Cir.2001).

to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule

73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is

entered for review by the district judge.

## II.    FACTS[2]

### A.    Plaintiff's Employment and Job Responsibilities

Plaintiff was employed by the Federal Bureau of Prisons (BOP) as a dental hygienist at FCI

Williamsburg from June of 2005 through her termination in 2010. Compl. at ¶ 20; Pl. Aff. (Ex. 15

to Def. Motion); Pl. Dep. p. 6 (Ex. 39 to Def. Motion). When she began this job at FCI

Williamsburg, she was the only employee in the dental office and worked alone with inmates.  Pl.

Dep. pp. 6-8.  During the time period in question, Plaintiff's immediate supervisor was Dr. Joyce

Davis, the Chief Dental Officer, and her second line supervisor, and Dr. Loranth, Chief Medical

---

[2]

A few notes must be made about the facts asserted by the parties in their memoranda.  First, in his
Memorandum, Defendant frequently cites to the factual allegations in Plaintiff's Complaint.
Generally, factual allegations without evidentiary support are insufficient to support a motion for
summary judgment.  See generally Rule 56, Fed.R.Civ.P.  However, to the extent Defendant is relying
on factual allegations raised by Plaintiff and Plaintiff does not dispute them, the undersigned will
accept them as true for purposes of this motion.

    Second, for many of the facts recited by Plaintiff in her Response, the citations to the record
do not support the facts asserted.  As one example, Plaintiff states in her Response "In October of
2007, the Plaintiff brought her disability to Ms. Merritt's attention."  Pl. Response p. 9.  In support of
this fact, Plaintiff cites to page 11 of her Affidavit.  However, page 11 of Plaintiff's Affidavit contains
no such evidence.  Instead, it recites numerous events that occurred in March of 2009.  See Pl. Aff. p.
11 (Ex. 1 to Pl. Response).  It is not the court's responsibility to comb the record to discover facts
supporting Plaintiff's arguments.  See Malina v. Baltimore Gas & Elec. Co., 18 F.Supp.2d 596, 604
(D.Md.1998) ("[I]t is the responsibility of the plaintiff, not the court, to identify with particularity the
evidentiary facts existing in the record which can oppose the defendant's summary judgment motion.
The court ... is not required to independently comb the record to look for them.").  Thus, in this Report
and Recommendation, the undersigned has included only those facts for which the parties have
provided evidentiary support.

    Finally, Plaintiff appears to have numbered all the pages of her exhibits sequentially.  Thus,
any reference to the page number of an exhibit submitted by Plaintiff will refer to the number listed
at the bottom of the page as "Page xx Plaintiff's Response."

Officer.  Pl. Aff.  Although Plaintiff's position title at FCI Williamsburg was "Dental Hygienist," her job description expressly provides that all employees of a federal correctional institution are correctional officers first. Position Description (Ex.. 16 to Def. Motion). Plaintiff's Position Description outlines the major duties and responsibilities of her dental hygienist job at FCI Williamsburg which include the following: planning and directing preventive dental health program, instructing patients in oral health care, performing complete oral prophylaxis, preparing patients for periodontal surgery, taking x-rays, etc. Id. As a correctional institution employee, Plaintiff's Position Description provides that she is charged with the responsibility for maintaining security at the institution: "The staff correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis." Id.

> The specific correctional responsibilities are detailed as follows:
>
> Specific correctional responsibilities include custody and supervision of inmates, responding to emergencies and institution disturbances, participating in fog and escape patrols, and assuming correctional officer posts when necessary. The incumbent is required to shakedown inmates, conduct visual searches of inmate work and living areas for contraband, and is responsible for immediately responding to any institution emergencies.  The incumbent must be prepared and trained to use physical control in situations where necessary, such as in fights among inmates, assaults on staff, and riots or escape attempts.

Id.  Further, "[a]ll staff in the correctional facility, regardless of their occupations, are expected to perform law enforcement functions." Id.  Additionally, "[t]he duties of this position require frequent direct contact with individuals in detention suspected or convicted of offenses against the criminal laws of the United States."  Id.  Moreover, "[d]aily stress and exposure to potentially dangerous situations such as physical attack are an inherent part of this position; consequently, it has been designated as a law enforcement position . . . covered under special retirement provisions for law

enforcement officers. . . ." Id.

Plaintiff had the authority to carry firearms and exercise appropriate force to establish and maintain control over individuals; further, the position description required her to complete specialized training in firearms proficiency and self defense. Id.

### B.    Plaintiff's Medical Conditions and Request for Accommodation

Plaintiff experienced her first seizure in the health services department at FCI Williamsburg on September 27, 2007. 2009 Report of Investigation pp. 52, 133 (Ex. 4 to Pl. Response); Pl. Aff. p. 4 (Ex. 1 to Pl. Response).  On October 3, 2007, Dr. Robert E. Kimpton, M.D., completed a medical note stating "Mrs. Griffin is under my care for an acute medical condition.  I recommend she work in a low risk environment with no use of firearms from now until she is released from my care." 2009 Report of Investigation p.124. Plaintiff asserts that she was verbally accommodated by Defendant at all times from September of 2007 until January of 2009.[3] 2009 Report of Investigation p. 54.

On December 18, 2008, Plaintiff was assigned to a housing unit for January 11, 2009, to January 17, 2009. Pl. Aff. pp. 7-8.  Prior to this assignment, Plaintiff had never been required to work a custody post except once for lunch relief for one hour.  Pl. Aff. p. 8.  On that occasion, she was allowed to have another employee accompany her in case she had a seizure.  Id.  However, John

---

[3]Plaintiff asserts that on September 19, 2008, Steve Langford, Associate Warden, and Anessa Merritt, Health Services Administrator, indicated that Plaintiff should work a custody shift. Pl. Aff. p. 7; 2009 Report on Investigation pp. 49-50 (setting forth the positions of Langford and Merritt).  On September 29, 2008, Plaintiff's neurologist placed her on light duty due to her seizures and migraines. Compl at ¶51; Work Limitations (Ex. 22 to Def. Motion).  Based upon Plaintiff's representation that she was accommodated at all times from September of 2007 until January of 2009, it does not appear that Plaintiff was actually assigned to a custody shift during this time.

Owen, Warden at FCI Williamsburg, explains that when custodial staff had annual training, non-custody staff had to fill the custodial positions[4] during the training period.  Owen Dep. p. 17-18.  A lieutenant would put together a roster of the non-custody staff to fill the custodial positions, which would be reviewed by union representatives and then assigned to the staff.  Id.  Prior to putting the roster together, non-custody staff members, based upon seniority, could bid on their preferred assignment.  Id.

On January 14, 2009, Plaintiff submitted a DOJ Form 100A, Request for Reasonable Accommodation, stating "I am requesting to be exempt from a correctional post."  Compl. at ¶81; Request for Reasonable Accommodation (Ex. 19 to Def. Motion).  In the form, Plaintiff provided, "I have seizures that come on quickly and I will not have enough time to hit my body alarm. I will not be able to defend myself. I am currently under the care of a neurologist."  Id.  She also stated that she was "scheduled to work a post this weekend."  Id.  Plaintiff also submitted an unsigned document dated January 16, 2009, entitled "Work Limitations" from Strand Regional Specialty Associates which recommended six months of light duty with one restriction: "No Correctional Posts; Restriction in effect until followup appointment on 6/16/09."  Work Limitations dated January 16, 2009 (Ex. 29 to Def. Motion).  Plaintiff asserts that she was only requesting a temporary accommodation of not being placed in a housing unit until she was able to adjust to new medication she had recently been prescribed.  Pl. Aff. p. 8; Turner Dep. p. 360; 363 (Ex. 12 to Pl. Response).

---

[4]Custodial positions are assigned to employees in the Correctional Services Department and include the lieutenant, officers, tool room, armory, lock shop and investigative staff.  Owen Dep. p. 14.  Any other positions are considered non-custody.  Id.  However, all non-custody staff members are trained to cover the custodial positions because all staff members are correctional officers first.  Id.  Certain positions are exempt from serving at a custody post, including the doctor, physician assistant, dentist, chaplin, and commissary staff.  Id. at 14-15.

On January 20, 2009, Human Resource Manager Nicole Cunningham wrote to William Turner, Plaintiff's union representative, regarding Plaintiff's Request for Reasonable Accommodation: "After reviewing Plaintiff 's request and the attendant documentation, we have concluded that we are unable to determine whether she is a qualified individual with a disability as defined under the Rehabilitation Act." Cunningham Memorandum of January 20, 2009 (Ex. 28 to Def. Motion). Further, Cunningham wrote, "the information is insufficient for us to make a determination of what accommodation would be appropriate if she were to meet the requirements of the Rehabilitation Act." Id.

Cunningham's Memorandum to Turner provided a copy of Plaintiff 's position description and specifically requested certain medical documentation:

> In order for us to assess the necessity and/or reasonableness of this request, we will need medical information including the following documentation: (1) assessment of the current clinical status and plans for future treatment; (2) diagnosis; (3) an estimate of the expected date of a full or partial recovery; (4) an explanation of the impact of the medical condition on life activities both on and off the job; (5) a narrative explanation of the medical basis for any conclusion that the medical condition has or has not become static or well stabilized; (6) a narrative of the medical basis for any conclusion which indicates the likelihood that you are or are not expected to experience sudden or subtle incapacitation as a result of the medical condition; (7) a narrative explanation of the medical basis for any conclusion that duty restrictions or accommodations are or are not warranted, and if they are, an explanation of their therapeutic or risk avoiding value and the nature of any similar restrictions or accommodations recommended for non-work-related activities; (8) a narrative explanation of the medical basis for any conclusion which indicates the likelihood that Plaintiff  is or not expected to suffer injury or harm by carrying out, with or without accommodation, safely the tasks or essential functions of her position.

Id.

-6-

On January 22, 2009, Plaintiff received an email that she was assigned to a housing unit for January 25, 2009, to January 31, 2009. Pl. Aff. p. 8; 2009 Report of Investigation p. 177. Joyce Davis told Plaintiff that someone in the Health Services Department insisted that Plaintiff be placed in a housing unit. Pl. Aff. p. 8. On January 23, Turner informed Plaintiff that Ray Holt[5] told him Plaintiff's request would be accommodated. 2009 Report of Investigation p. 135. On January 25, 2009, Plaintiff was placed on AWOL status. Compl. at ¶90.

On January 26, 2009, Plaintiff was placed on alternative duty status, relieved of her duties as dental hygienist and reassigned as a phone monitor in the Training Center near the Prison Camp outside the fence surrounding the main institution. Pl. Aff. p. 9; 2009 Report of Investigation p. 54; Turner Dep. p. 365; Owen Dep. pp. 25-28 (Ex. 1 to Def. Reply). The Prison Camp is approximately half of a mile away from the main institution and the Training Center is another quarter of a mile past the Prison Camp. Owen Dep. p. 25. The Training Center and the Prison Camp are separated by a wooded area and both are separated from the main institution by a large wooded area. Id. An inmate from the Prison Camp[6] cleans the Training Center. Normally, the inmate is supervised by staff but not always.[7] Owen Dep. p. 27; Turner Dep. at pp.365-66. There are other areas within the prison where Plaintiff could have performed phone monitoring. Turner Dep. p. 367. On numerous occasions, Plaintiff worked alone in the training center while monitoring inmate calls. Pl. Aff. pp. 10-11. On two occasions, March 6, 2009, and March 10, 2009, inmates were working in the

---

[5]It is not clear from the record who Ray Holt is.

[6]The inmates located at the Prison Camp are minimal security inmates. Owen Dep. p. 27.

[7]The Training Center remains locked and a staff member will let the inmate into the Training Center to clean it. Owen Dep. p. 27.

Training Center while Plaintiff was there.  Pl. Aff. p. 11.  On one of those occasions, Plaintiff and the inmate were the only two people in the Training Center.  Id.

Plaintiff complains she was denied access to the prison and claims retaliation in restricting her access. Compl. at ¶¶ 103-04. Plaintiff was not allowed in certain areas of the prison and no longer allowed in the health services department. Compl. at ¶108. She was unable to attend a department party due to the restricted access. Pl. Aff. p. 10. Further, she was not allowed to attend a fundraiser for a co-worker who had lost his home due to fire. Pl. Aff. p. 11.

On February 5, 2009, Plaintiff used her personal leave to return to the neurologist to obtain additional medical information requested by Cunningham.  Pl. Aff. p. 10.  She also visited a general practitioner for help coping with work related stress.  Id.  On February 6, 2009, Cunningham informed Plaintiff that the BOP would not pay for medical visits for Plaintiff to obtain the medical documentation requested by Cunningham.  Id.

Plaintiff met with a psychiatrist on three occasions, March 2, 9, and 16, 2009, due to work related stress.  Pl. Aff. pp. 10-12.  Plaintiff claims that her anxiety and panic attacks increased as she worked in the training center performing inmate phone monitoring duties because she had no body alarm and unescorted inmates used the training center.  Compl. at ¶100. On March 17, 2009, the stress at work had become so unbearable for Plaintiff that she left and went straight to the psychiatrist's office, who decided to admit her to a treatment center the next morning. Pl. Aff. p. 12.

In a letter dated March 17, 2009, Dr. William A. Van Horn from Coastal Neuropsychiatry, stated that Plaintiff "will need to be absent from work due to medical reasons. This order will last until further notice which we will provide at the appropriate time."  Van Horn Letter Dated March

17, 2009 (Ex. 27 to Def. Motion).  On March 19, 2009, Cunningham sent a letter to Plaintiff responding to Dr. Van Horn's letter of March 17, 2009.  Cunningham Letter Dated March 19, 2009 (Ex. 30 to Def. Motion).  In this letter, Cunningham explained to Plaintiff that Dr. Van Horn's letter "lacks specificity" and required additional medical documentation.  Id.  On March 20, 2009, Dr. Van Horn indicated that Plaintiff was being treated for Major Depression and Panic Disorder due to stress at work.  Van Horn Letter Dated March 20, 2009 (Ex. 31 to Def. Motion).  Dr. Van Horn stated that the treatment would take several weeks to process the pain and depression Plaintiff was suffering. Id.

On March 25, 2009, Cunningham wrote to Turner, telling him that Plaintiff  would have to request leave from her supervisor for time she is out of work due to her illness and reminded him of the leave she had remaining.  Cunningham Letter Dated March 25, 2009 (Ex. 32 to Def. Motion). This same day, Dr. Van Horn wrote a follow-up letter providing Plaintiff 's dates of treatment in March of 2009 and describing her diagnosis as: "Major Depression, Recurrent; Panic Disorder without Agroa.; and is dealing with anxiety, insomnia and panic attacks...Mrs. Griffin has been under tremendous tress at work. The Etiology of her brain illness is multifactorial. The stress at work is a significant factor."  Van Horn Letter Dated March 25, 2009 (Ex. 33 to Def. Motion).

On April 6, 2009, Cunningham wrote to Plaintiff  that "we are still not in receipt of the medical documentation which was requested from you in the January 20, 2009, memorandum addressed to William Turner in reference to your medical condition for which you were requesting Reasonable Accommodation."  Cunningham Letter Dated April 6, 2009 (Ex. 34 to Def. Motion).

On May 20, 2009, Cunningham wrote to Turner, outlining the attempts the BOP had made

to obtain medical information related to Plaintiff's request for reasonable accommodation which was dated January 14, 2009.  Cunningham Letter Dated May 20, 2009 (Ex. 35 to Def. Motion). The attempts to obtain this information dated back to January 20, 2009, and included numerous extensions granted to Plaintiff. Id.

On June 16, 2009, Dr. Van Horn wrote a letter  stating, "Ms. Leigh Ann Griffin will need to be absent from work due to medical reasons. This order will last until further notice which we will provide at the appropriate time."  2009 Report of Investigation p. 130.

On July 27, 2009, Dr. Joyce Davis wrote to Plaintiff regarding her LWOP (Leave Without Pay) status since April 7, 2009.  Davis Letter Dated July 27, 2009 (Ex. 25 to Def. Motion). Dr. Davis explained that , "[b]efore further leave can be approved, you must substantiate your illness." Id.  To substantiate her illness, Plaintiff was given two options: (1) see Dr. Raymond Allen at Kingstree Family medicine or (2) provide documentation from your own personal physician.  Id.  An appointment, paid for by the BOP, with Dr. Allen was scheduled for August 4, 2009, at 10:20 a.m. Id.[8] If Plaintiff chose the option of providing documentation from her own physician, she was required to provide the following information by August 11, 2009:

    1) assessment of the current clinical status and plans for future treatment,
    2) diagnosis,
    3) an estimate of the expected date of a full or partial recovery,
    4) an explanation of the impact of the medical condition on life activities both on and off the job,
    5) a narrative explanation of the medical basis for any conclusion that the medical condition has or has not become static or well-stabilized,

---

[8]It does not appear that Plaintiff attended this appointment. Neither party points to any medical records from Dr. Allen.

6) a narrative explanation of the medical basis for any conclusions which indicates the likelihood that you are or are not expected to experience sudden or subtle incapacitation as a result of the medical condition,

7) a narrative explanation of the medical basis for any conclusion that duty restrictions or accommodations are or are not warranted, and if they are, an explanation of their therapeutic or risk-avoiding value and the nature of any similar restrictions or accommodations recommended for non-work-related activities.

8) a narrative explanation of the medical basis for any conclusion which indicates the likelihood that you are or are not expected to suffer injury or harm by carrying out, with or without accommodation safely, the tasks or essential functions of your position.

Id. The BOP enclosed her position description with the letter. This information was the same medical information Ms. Cunningham had requested in January of 2009.

On October 8, 2009, and October 16, 2009, Dr. Van Horn again wrote that Plaintiff is "not able to function at work." He listed her diagnoses as Major Depressive Disorder, Recurrent, Unspecified; Panic Disorder, without Agoraphobia (3) Posttraumatic Stress Disorder.  Dr. Van Horn stated that "the most significant contributor [to her illness] was the enormous stress that [Plaintiff] experienced while employed at the Federal bureau of prisons."  Van Horn Letters Dated October 8 and 16, 2009 (Ex. 37 to Def. Motion).

On February 8, 2010, Cunningham wrote to Plaintiff  stating that "based on the medical documentation you have provided, it appears that your medical/psychiatric restrictions are permanent and full recovery is not expected. Cunningham Letter Dated February 8, 2010 (Ex. 24 to Def. Motion).  Further, Cunningham wrote, "Based on these restrictions and your request to be exempted from working correctional posts, you are unable to perform the duties which are essential to your law enforcement position as a Dental Hygienist for the Federal Bureau of Prisons."  Id.  Cunningham offered assistance in helping Plaintiff  find other positions for reassignment within the Department

of Justice.  Id.  On February 17, 2010, Plaintiff wrote to Cunningham that she looked "forward to the meaningful interactive process as required by law, to seek a reasonable accommodation for what appears to be a temporary disability." Pl. Letter Dated February 17, 2010 (Ex. 26 to Def. Motion).

On May 14, 2010, Cunningham informed Plaintiff that "[b]ased on documentation you have provided, it appears you are unable to perform the duties which are essential to your law enforcement position as a correctional worker for the Federal Bureau of Prisons." Cunningham Letter dated May 14, 2010 (Ex. 20 to Def. Motion). Further, Cunningham explained,

> As you know, all positions located within a correctional institution are considered hazardous duty law enforcement officer positions. Every position at the institution requires the individual to be able to perform correctional work safely and successfully, including the ability to respond effectively to emergencies. The ability to respond effectively to emergencies is an essential function of every position located within a correctional institution because the inability to do so may jeopardize the security of the institution and safety of staff and inmates. The Agency will not eliminate the essential function of responding to emergencies from any of its positions at the institution as a form of reasonable accommodation.

Id.

On August 3, 2010, Dr. Joyce Davis sent Plaintiff a letter proposing to remove her from her position as Dental Hygienist. Letter Proposing Removal (Ex. 38 to Def. Motion). Dr. Davis stated that Plaintiff "[has] been physically/medically unable to safely perform the essential functions of your position for over one year."  Id. She summarized the medical information received to date: medical documentation diagnosis of seizure/migraines, major depressive disorder (recurrent, unspecified), panic disorder without agoraphobia and Post Traumatic Stress Disorder.  Id.  She also referenced Dr. Van Horn's letter of October 8, 2009, which states that Plaintiff is still severely depressed and not able to function at work.  Id.  Once again, Dr. Davis referred Plaintiff to her letter

of July 27, 2009, which recited the eight areas that needed to be addressed by her medical professionals. Dr. Davis then added the following statement:

> 8) . . . The medical information Dr. Van Horn provided does not indicate there is any expectation that your condition will improve. Based on your physicians diagnosis and restrictions, it has been determined you cannot safely perform the essential functions of your position. At the present time, your physician has indicated that you cannot physically perform the following kinds of duties, which are critical to your position: No climbing, no prolonged standing/walking, no lifting/carrying over 40 pounds and no kneeling, squatting or crawling.

Id. Plaintiff did not provide a written or oral response to this proposal for consideration.  Letter of Proposed Removal (Ex. 23 to Def. Motion).

On November 30, 2010, John R. Owen, Warden at FCI Williamsburg, sent a letter outlining his decision to remove her from her position as Dental Hygienist. Letter of Removal (Ex. 23 to Def. Motion). Warden Owen noted that Plaintiff had not responded to the Proposed Removal letter, had not presented any medical documents since October of 2009, although FCI Williamsburg had continuously requested additional medical documentation, and had not responded to the offer of available positions in the Department of Justice.  Id.  Warden Owen summarized the medical documents which formed the basis of his decision:

> The last medical documentation we received was from your physician William A. Horn dated October 16, 2009. In this medical documentation, it states that you continue to suffer with significant and disabling symptoms due to Depression and PTSD (Post Traumatic Stress Disorder). There was also documentation from Dr. Van Hor Dated October 8, 2009, which stated you were still severely depressed and not able to function at work. Since January 20, 2009, we have continually asked for specific additional documentation relating to your medical condition. You have not provided sufficient documentation which addressed the requested documentation. As the last information we have is from October 2009, we must base the decision on that information. I have considered reassignment to other positions as well as accommodating your medical condition. However, there are no positions within the

-13-

Federal Correction Institution where you would not present a risk to your safety and the safety of others.

Id.

C.    **Plaintiff's EEO Activity**

In November of 2008, Plaintiff supported another employee, Tasha Johnson's, EEO Complaint by submitting a statement acknowledging the discrimination Johnson allegedly suffered. Pl. Aff. p. 7; 2009 Report of Investigation p. 49. In addition, Plaintiff filed three of her own Complaints of Discrimination, BOP-2009-0214 (the 2009 Complaint), BOP-2010-274 (the 2010 Complaint), and BOP-2011-0198 (the 2011 Complaint).

1.    **The 2009 Complaint**

On January 24, 2009, Plaintiff contacted an EEO counselor. 2009 EEO Counselor's Report (Ex. 1 to Def. Motion). On February 28, 2009, Plaintiff filed a Complaint of Discrimination claiming discrimination on the basis of sex, race, disability, and reprisal. 2009 Complaint of Discrimination (Ex. 2 to Def. Motion). The issues accepted for investigation were whether the BOP discriminated against Plaintiff because of her race (white Hispanic), sex, physical disability (seizure disorder), and protected EEO activity when (1) January 11, 2009, and March 16, 2009, Plaintiff claimed she was harassed concerning duty assignments (duties and duty locations at the facility), her disability was not reasonably accommodated and her doctor's recommendations were not followed, she was required to use leave to obtain medical information for her supervisor, and she was denied access to the prison, and (2) on January 25, 2009, Plaintiff was charged with being absent without leave (AWOL). 2009 Acceptance Letter (Ex. 3 to Def. Motion).

The Final Agency Decision was issued on October 14, 2011. 2009 Final Agency Decision (Ex. 4 to Def. Motion). The Complaint Adjudication Office (CAO) determined that there was no evidence in the record that Plaintiff was treated worse than other white women with respect to duty assignments or any other factor. Id. The CAO also rejected Plaintiff 's claims of race and sex discrimination and found that other women from the Health Care Department were, like Plaintiff , placed on the relief roster for custody posts. Id. at 548. With regard to Plaintiff's complaints of disability discrimination based upon her request not to work a custody post due to her seizures, the CAO found that BOP officials accommodated her request by moving her to the Training Center at the Prison Camp where she monitored inmate phone calls. Id.

The CAO also found no evidence that Plaintiff was charged with being AWOL on January 25, 2009, because of her race or sex. With regard to her retaliation claim, the CAO found Plaintiff 's reporting of security breaches is not a protected EEO activity, and there was no evidence to support a claim of retaliation for her participation in another employee's complaint of discrimination; the BOP officials testified that they were not aware of Plaintiff 's EEO activity. Id. at 549.

The CAO also rejected claims of disability discrimination and found no evidence Plaintiff had a protected disability or that she was a qualified individual with a disability. Id. at 549-551. The Final Agency Decision noted that there is no reasonable accommodation that would allow Plaintiff to perform all the essential functions of her job because the prison has a law enforcement component which requires direct contact with inmates. Id. The Final Agency Decision also noted that Plaintiff did not participate in the interactive process because she did not respond to reasonable requests for medical information about her alleged disability. Id. at 552.

-15-

## 2. The 2010 Complaint

On February 9, 2010, Plaintiff contacted an EEO Counselor. 2010 EEO Counselor's Report (Ex. 5 to Def. Motion). On March 23, 2010, the BOP received Plaintiff's Complaint of Discrimination.  2010 Complaint of Discrimination (Ex. 6 to Def. Motion). Plaintiff  listed three complaints: (1) her name was not placed on the OSHA Logs in 2007 or 2009; (2) her sick and annual leave were being withheld; (3) she received a letter dated February 8, 2010, from Nicole Cunningham, Employee Services Manager at FCI Williamsburg stating that Plaintiff's medical/psychiatric restrictions are permanent and a full recovery is not expected.  Id.  She alleged she was discriminated against on the basis of race (White Hispanic), Sex, reprisal and mental and physical disability.  Id.

After reviewing the complaints, the BOP accepted for investigation Plaintiff's complaint regarding allegations of withholding earned annual and sick leave between December 26, 2009, and February 9, 2010.  2010 Letter of Acceptance (Ex. 7 to Def. Motion). However, the EEO office dismissed for failure to state a claim Plaintiff 's claims related to failure to enter her alleged injuries into the OSHA logs, failure to assist her with workers compensation claims, and the letters written by Cunningham regarding the permanency of her medical/psychiatric restrictions.  Id.

An investigation began on the remaining issue regarding allegations of withholding sick and annual leave.  2010 Report of Investigation (Ex. 8 to Def. Motion). On September 29, 2010, counsel for Plaintiff  notified the EEO investigator that she was dropping the following bases for the complaint: race/color, sex, and disability. Correspondence from Plaintiff's counsel (Ex. 9 to Def. Motion). Thus, Plaintiff 's remaining claim related to withheld leave (10 total hours) was based only

on retaliation.

A Final Agency Decision was issued on January 9, 2012. 2010 Final Agency Decision (Ex. 10 to Def. Motion). The Final Agency Decision summarized the issue as follows: "The issue in this case concerns Plaintiff 's claim that, while she was off from work on medical leave without pay (LWOP), BOP did not pay her for six hours of annual leave and four hours of sick leave she had earned between December 26, 2009 and February 9, 2010." Id. at 1104. The Final Agency Decision noted that Plaintiff never submitted a leave slip and never requested to be paid for the ten hours of leave. Id. at 1106. The FAD determined "[t]here is no other persuasive evidence in the record showing that BOP was motivated by a retaliatory animus in this case." Id. at 1107.

### 3.    The 2011 Complaint

On or about January 20, 2011, Plaintiff contacted an EEO Counselor regarding a letter of termination she received on December 14, 2010, from Warden John Owen.  2011 EEO Counseling Contact (Ex. 11 to Def. Motion). The complaints reviewed with the EEO Counselor involve discrimination based upon reprisal for prior EEO activity and her request for a reasonable accommodation for her alleged disability. Id. On or about February 28, 2011, Plaintiff filed her Complaint of Discrimination, which claimed retaliation based upon previous EEO activity and based upon her alleged disability. 2011 Complaint (Ex. 12 to Def. Motion); Attachment to EEO Complaint (Ex. 17 to Def. Motion). On April 1, 2011, citing Title VII, the BOP sent Plaintiff a letter accepting the following claim for investigation: "Specifically, you claim the Bureau unlawfully discriminated against you on the basis of reprisal in relation to the following: On December 5, 2010, you allege that you were terminated from the position of Dental Hygienist." 2011 Acceptance Letter (Ex. 13 to Def.

Motion). An investigator was appointed and issued a report on August 17, 2011, citing Plaintiff 's claim that she was discriminated against when she was terminated based on her disability and prior EEO activity. 2011 Report of Investigation (Ex. 14 to Def. Motion). On November 22, 2011, Plaintiff waived her right to a hearing and requested a final agency decision. Request for Final Agency Decision (Ex. 18 to Def. Motion). At the time Plaintiff filed her Response to Defendant's Motion for Summary Judgment in the present action, no Final Agency Decision had been rendered, and Plaintiff asserts that the issues raised in the 2011 Complaint, that is, issues related to her termination, are not currently before this court.[9]

Plaintiff filed this action in federal court on January 23, 2012, listing causes of action for disability discrimination, hostile work environment, and retaliation.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita

_____

[9]By statute, Plaintiff may bring a complaint in this court 180 days after filing her initial EEO Complaint if she has not received a final agency decision. 42 U.S.C. § 2000e-16(c). Nevertheless, Plaintiff represents that this action does not involve her termination as raised in the 2011 Complaint, and, thus, the court will does address any such claim.

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving

party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may

not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on

must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."

Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere

allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present

evidence supporting his or her position by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v.

Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir.

1993); Local Rules 7.04, 7.05, D.S.C.

IV.    **DISCUSSION**

A.    **Hostile Work Environment**

Plaintiff alleges that she was subjected to a hostile work environment because of her sex,

race, and disability. Title VII and the Rehabilitation Act prohibit an employer from subjecting an

employee to a hostile work environment because of the employee's protected class. 42 U.S.C. § 2000e–2(a)(1); Pueschel v. Peters, 577 F.3d 558, 564–65 (4th Cir.2009). Defendant first argues that Plaintiff has failed to exhaust her administrative remedies with respect to her hostile work environment claim because she failed to raise the issue in any of her EEO Complaints.

A federal employee must seek administrative review of his grievance before filing a suit for unlawful discrimination in employment. See 42 U.S.C. § 2000e-16(b) and (c); 29 C.F.R. § 1613.211 et seq.; Zografov v. V.A. Medical Center, 779 F.2d 967, 968-69 (4th Cir. 1985). Plaintiff argues that she raised the issue in the 2009 Complaint. Specifically, in a statement attached to her 2009 Complaint, Plaintiff stated, Please allow this letter to service as my complaint of discrimination and reprisal against Federal Bureau of Prisons-Federal Correctional Institute in Williamsburg SC. . . . I have been discriminated on the basis of sex race, disability and reprisal. This has been ongoing and put me through incredible stress by working in a humiliating and hostile work environment." 2009 Complaint of Discrimination (Ex. 2 to Def. Motion). Thus, Plaintiff has exhausted her administrative remedies with respect to her hostile work environment claim.

Defendant next argues that, even if Plaintiff has exhausted her administrative remedies with respect to this claim, she fails to present sufficient evidence to support it. To establish a hostile work environment claim under Title VII or the Rehabilitation Act, a plaintiff must show that: (1) she is a member of a protected class under Title VII or is a qualified individual with a disability; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment; and (5) some factual basis exists to impute liability for the harassment to the employer. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183–84 (4th Cir.2001) (setting out elements of a hostile work

-20-

environment claim under Title VII); <u>Pueschel</u>, 577 F.3d at 564–65 (recognizing a hostile work environment claim under the Rehabilitation Act). Specifically, Defendant argues that Plaintiff fails to show that she suffered harassment that was sufficiently severe or pervasive to alter the conditions of employment.

Plaintiff must show not only that she subjectively believed her workplace environment was hostile, but also that a reasonable person could perceive it to be objectively hostile. <u>Equal Employment Opportunity Comm'n v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315 (4th Cir.2008). A hostile work environment is actionable only when the workplace "is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

Plaintiff argues that Defendant created a hostile work environment by originally insisting that she work in a custody position despite her supervisors' knowledge of her seizure condition, thereafter requiring her to work alone in the training center despite her seizure condition, limiting her access to certain areas of the prison, which prevented her from attending a party and a fund raiser for her co-workers, and subjecting her to numerous requests for medical information. However, although Plaintiff was assigned to work a custody position for approximately two weeks in January of 2009, there is no evidence that she was assigned to a custody position once she was placed on alternative duty status on January 26, 2011, while Cunningham took into consideration her request for an accommodation to be relieved from such responsibilities and the medical documentation she

submitted in support.[10]   In addition, even though Plaintiff was assigned to work in the Training Center, the evidence reveals that she was working alone in the Training Center while an inmate was present on only one occasion.  Plaintiff's access to the main prison building was restricted while Cunningham determined the extent of the accommodation needed by Plaintiff and the inability to attend functions located in the main building was a unfortunate consequence.  Plaintiff fails to present sufficient evidence to show that her access to the main building was restricted for harassment purposes.  Finally, Plaintiff fails to show that Cunningham's requests for medical documentation to support her requested accommodation were somehow inappropriate.  For these reasons, Plaintiff fails to show that her work environment was so permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment.  As such, summary judgment is appropriate on Plaintiff's hostile work environment claim.

### B.        Disability Discrimination

The Rehabilitation Act prohibits federal agencies from discriminating against qualified employees based on a disability.  29 U.S.C. § 794.  The familiar proof scheme developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to claims brought under the Rehabilitation Act.  See Ennis v. National Ass'n of Business & Educ. Radio, Inc., 53 F.3d 55, 57–58 (4th Cir.1995).  Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.

---

[10]Defendant refrained from assigning Plaintiff to a custody position even though Cunningham had indicated that the medical documentation Plaintiff had submitted was insufficient to support the requested accommodation and Plaintiff had not provided the additional documentation requested by Cunningham.

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him.

Plaintiff alleges that Defendant violated the Rehabilitation Act by failing to accommodate her disability. "In a failure to accommodate case, a plaintiff establishes a prima facie case by showing '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the [employer] refused to make such accommodations.'" Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (citing Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir.1999)).

-23-

Plaintiff appears to limit her failure to accommodate claim to Defendant's alleged failure to accommodate her as a result of her seizure condition prior to the onset of her subsequent depression, anxiety disorder and PTSD.[11]   In her initial request for accommodation, Plaintiff requested "to be exempt from a correctional post."  Request for Reasonable Accommodation (Ex. 19 to Def. Motion). She explained, "I have seizures that come on quickly and I will not have enough time to hit my body alarm.  I will not be able to defend myself.  I am currently under the care of a neurologist."  Id. Plaintiff performed her duties as a dental hygienist without any accommodation from the time she had her first seizure in September of 2007 until January of 2009, when she was first assigned to a housing unit.[12]   Prior to January of 2009, Plaintiff had never been assigned to a correctional post except for relief duty one day during lunch.  However, as explained by the Warden, non-custody staff are responsible for covering the custodial positions when those officers are in annual training.  Thus, occasions would arise when Plaintiff would need to work a correctional post.

Plaintiff filed her formal Request for Reasonable Accommodation on January 14, 2009.  In support of her request, she submitted an unsigned document dated January 16, 2009, entitled "Work Limitations" from Strand Regional Specialty Associates which recommended six months of light duty with one restriction: "No Correctional Posts; Restriction in effect until followup appointment on 6/16/09."  Work Limitations dated January 16, 2009 (Ex. 29 to Def. Motion).  The only other medical evidence Defendant had received prior to this note was the letter of On October 3, 2007,

---

[11] In her Response, Plaintiff asserts that she has not received a Final Agency Decision with respect to her 2011 EEO Complaint, and thus, the issues raised in that Complaint, which include her termination, are not ripe for this court.  Pl. Response p. 3.

[12] Although not explicitly set forth in the record, it appears that working in a housing unit equates to a "custody" or "correctional" post.

where Dr. Kimpton recommended that Plaintiff "work in a low risk environment with no use of firearms from now until she is released from my care." 2009 Report of Investigation p.124.   On January 20, 2009, Cunningham requested additional information to properly consider Plaintiff's request.  Plaintiff never provided the requested information.

Plaintiff argues that she could have continued to work as a dental hygienist with the limited accommodation that she not be assigned to a correctional post.   However, a reasonable accommodation "does not require an employer to reallocate essential job functions or assign an employee 'permanent light duty.'" Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir.2011).   An "essential function" is defined as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Although not an exhaustive list, a job function may be viewed as essential if: (1) "the reason the position exists is to perform that function;" (2) there are a "limited number of employees available among whom the performance of that job function can be distributed;" and/or (3) "the incumbent in the position is hired for his or her expertise or ability to perform the particular [highly specialized] function." 29 C.F.R. § 1630.2(n)(2)(iiii).

According to these regulations, certain evidence may be considered in determining whether a particular function is essential:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3) (recognizing the list of potential evidence is illustrative rather than comprehensive).

Although Plaintiff's position title at FCI Williamsburg was "Dental Hygienist," her job description expressly provides that all employees of a federal correctional institution are correctional officers first. Position Description (Ex. 16 to Def. Motion). Plaintiff's Position Description outlines the major duties and responsibilities of her dental hygienist job at FCI Williamsburg which include planning and directing preventive dental health program for the inmates, instructing patients (inmates) in oral health care, performing complete oral prophylaxis, preparing patients (inmates) for periodontal surgery, taking x-rays, etc. Id.

However, as a correctional institution employee, Plaintiff's Position Description provides that she is charged with the responsibility for maintaining security at the institution: "The staff correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis." Id. at 362. The specific correctional responsibilities of Ms. Griffin's position are custody and supervision of inmates, responding to emergencies and institution disturbances, participating in fog and escape patrols, and assuming correctional officer posts when necessary. Id. Further, the job description requires that she shakedown inmates, conduct visual searches of inmate work and living areas for contraband, and respond immediately to any institution emergencies. She must be prepared and trained to use physical control in situations where necessary, such as in fights among inmates, assaults on staff, and riots or escape attempts. Id.

Because Plaintiff's position as a dental hygienist required her be a correctional officer first,

-26-

eliminating that duty would amount to eliminating an essential function of her position, which the Rehabilitation Act does not require.

Furthermore, simply because an employer chooses to temporarily accommodate an employee with a disability by eliminating essential duties, the employer may not be required to continue such an accommodation permanently, especially when another reasonable accommodation has been provided. See Winfred v. City of Chicago, 259 F .3d 610, 616 (7th Cir.2001) ("If an employer bends over backwards to accommodate a disabled worker ... it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.") (internal citations omitted);  Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1528 (11th Cir.1997) (holding that an employer was not required to continue to excuse detective with visual impairment from collecting evidence at crime scene);  Laurin v. Providence Hosp., 150 F.3d 52, 60–61 (1st Cir.1998) ("An employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous.").

Additionally, the Rehabilitation Act does not require Defendant to provide Plaintiff with the accommodation of her choice.  See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285–86 (11th Cir.1997) ("[a] qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation."). While an employee's preference for one accommodation over another may be taken into account, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide."

29 C.F.R. 1630.9 app. Indeed, the accommodation chosen by the employer need not be the " 'best' accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated." Id.; see also Corrigan v. Perry, No. 97–1511, 1998 WL 129929, at **9 (4th Cir. March 24, 1998).  On January 26, 2009, Defendant accommodated Plaintiff's request by placing her on light duty as a telephone monitor in a low risk environment at the Training Center, which was located near the Prison Camp outside the fence surrounding the main institution.  Plaintiff was not assigned to a correctional post after January 26, 2009.   The ADA states that "reasonable accommodation may include: (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). Any reasonable accommodation by an agency is sufficient to satisfy its legal obligation. Schmidt v. Methodist Hosp. of Indiana, Inc., 89 F.3d 342, 344–45 (7th Cir.1996). The inquiry ends when an employer shows that a reasonable accommodation was afforded the employee, regardless of whether the accommodation was one which the employee suggested. Beadle v. Hillsborough County Sheriff's Department, 29 F.3d 589, 592 (11th Cir.1994).  Accordingly, because Defendant provided Plaintiff with a reasonable accommodation, Plaintiff's failure to accommodate claim fails and summary judgment is appropriate on this claim.

### C.      Retaliation

Plaintiff argues that Defendant retaliated against her for participating in the discrimination case of another employee.  She argues that Defendant failed to accommodate her in retaliation for her support of Tasha Johnson's EEO Complaint.

-28-

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998).

The evidence submitted by Plaintiff is insufficient to show that she suffered an adverse employment action.  For the reasons discussed above, Defendant did accommodate her request not to be placed in a correctional post, albeit not the specific accommodation she requested.  Thus, Plaintiff fails to establish a prima facie case of retaliation and summary judgment is appropriate on this claim as well.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 22) be granted and this case be dismissed in its entirety.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 21, 2013
Florence, South Carolina

-29-